CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
MAY 1 2 2005
JOHN F. CORCORAN, CLERK
BY: /s/ HMcDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| UNTIED STATES OF AMERICA | ) Case No. 4:05CR00001 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| JOHN CLIFFORD SIMMS, | ) By: Jackson L. Kiser |
| Defendant. | ) Senior United States District Judge |

Before me is Defendant's Motion to Suppress. Oral argument was heard on May 6, 2005. The issue is therefore ripe for decision. For the reasons stated below, I hereby **GRANT** Defendant's Motion to Suppress.

## STATEMENT OF FACTS

During the 2001-2002 hunting season, various residents of the Fisher Farm Road area of Henry County filed complaints concerning gunshots at night with Virginia Game Warden Darrell Hatcher ("Hatcher"), an employee of the Virginia Department of Game and Inland Fisheries. Upon investigation, Hatcher learned that other residents and hunters in the area had observed people hunting with rifles from ATVs on a trail beneath the power line between Chestnut Knob and the Rich Acres area. Hatcher began conducting night patrols of the area and checking hunters during the day. He also checked the Henry Country tax map and discovered that the property near the power lines was owned by Betty Simms. The hunting season expired shortly

thereafter, and Hatcher discontinued his investigation until the next season.

In the 2002-2003 hunting season, Hatcher learned that Betty Simms lived with John Simms ("Defendant"), her ex-husband and a convicted felon, at 104 Mica Road. On November 11, 2003, Hatcher observed Defendant drive an ATV out of the woods into a semi-trailer located near the cabin area and lock the trailer. Defendant appeared to have a weapon, but Hatcher could not be certain due to dim lighting. Hatcher engaged the assistance of ATF agents in conducting video surveillance of the premises. Numerous hunting violations were observed, but nobody saw Defendant with a firearm.

Hatcher learned that Betty Simms also owned a 22-acre property at 11387 Greensboro Road in Henry County. During a patrol of that property on November 7, 2003, he found a tree stand in a field behind the house and a spent 12-gauge shell casing. Later that month, Hatcher found a dead end road in North Carolina that took him to a clear cut which allowed a view of the rear of the Greensboro Road house. On November 13, 2004, Hatcher set up surveillance in that clear cut. Using a spotting scope and binoculars, he observed Defendant carrying a shotgun and walking with his young child and dog. Defendant walked through the back yard and towards the field behind the house at which point Hatcher lost sight of him. About thirty minutes later, Hatcher observed Defendant walk back towards the house with the same shotgun, child and dog. Hatcher again lost sight of him when Defendant reached the front of the house.

At that point, Hatcher phoned State Police Officers Mabe and Roberts to assist him in arresting Defendant. Twenty minutes later, the officers met Hatcher at the end of Defendant's driveway on U.S. Route 220, the only public road abutting the property. They then proceeded down the private driveway and found Defendant in the side yard. Hatcher told Defendant that he was being arrested for possession of a firearm by a convicted felon, handcuffed him, advised him

of his Miranda rights, and then interrogated him about the shotgun. Defendant told Hatcher that the shotgun was in a closet in the house and then brought Hatcher to the gun. Hatcher retrieved the gun and escorted Defendant to the Henry County Magistrate's Office. On the way, Defendant told Hatcher that he needed the gun to protect his property after a robbery in January 2004. They also discussed a previous encounter between the two of them in December 2003 in which Defendant warned other hunters about Hatcher's patrol presence.

## DISCUSSION

Defendant has filed a motion to suppress all evidence seized by Hatcher and all statements made by Defendant after his arrest on November 13, 2004 on the grounds that his warrantless arrest was unlawful. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONT. amend. IV. A person has a reasonable expectation of privacy while in his residence, including the curtilage, such that warrantless searches and seizures of a person in his residence or its curtilage are unconstitutional absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 575 (1980); *U.S. v. Taylor*, 90 F.3d 903, 908 (4th Cir. 1996).

The Government does not dispute that the arrest was made in the curtilage of Defendant's residence or that Hatcher failed to obtain a warrant. Instead, the Government argues that the warrantless arrest was proper under three rationales: (1) Defendant was in plain view; (2) exigent circumstances justified the arrest; and (3) Hatcher was in hot pursuit of Defendant.[1]

---

[1] The lawfulness of Hatcher's surveillance from the clear cut is not before me at this time.

A.   *Public Place*

First, the Government argues that Defendant's warrantless arrest was proper because Defendant was in plain view on his property. The Government contends that precedent establishes that an officer may make a warrantless arrest of a person who is in plain view even if they are in their residence or its curtilage. *United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989); *United States v. Santana*, 427 U.S. 38, 42 (1976); *United States v Varkonyi*, 645 F.2d 453 (5th Cir. 1981). But the Government has misstated the holdings in these cases. The courts were not holding that an officer may make warrantless arrests in the curtilage of a person's home if the officer can manage to find a way to create some view of the person's home or surrounding curtilage. Such a reading would eviscerate the protection afforded a person in his curtilage because it would be hard to imagine any curtilage that is hidden from all view. Rather, the courts in these cases were faced with circumstances in which the defendants *knowingly exposed* themselves to *public view* such that their homes effectively became a *public place* for purposes of the Fourth Amendment. Therefore, the question I must answer is whether Defendant knowingly exposed himself to public view in his yard so that the yard became a public place.

The facts of this case are distinct from those in *Santana, Hoyos,* and *Varkonyi.* In *Hoyos*, the defendant was peering over a fence and exposing himself to the view of anyone on the adjacent street. *Hoyos*, 892 F.2d at 1394. In *Santana*, the defendant was on the threshhold of her house and clearly visible from the street. *Santana*, 427 U.S. at 42. The Court stressed that she was not merely visible to the public but was completely exposed to public view, speech, hearing and touch. *Id.* In *Varkonyi*, the defendants were clearly visible from the roadway through an open gate and a fence. *Varkonyi*, 645 F.2d at 458. Unlike the defendants in *Santana, Hoyos,* and *Varkonyi,* Defendant has gone to extensive lengths to maintain his privacy. His 22-acre property is surrounded by woods, and the front of the house is about 700 feet from the only nearby roadway, Route 220. "No Trespassing" signs are posted at the entrance to the long driveway that

connects the house to Route 220. Much of the house and the surrounding property are not visible to people traveling on Route 220, and no other houses exist within sight. In fact, even from his high vantage point with a high-powered scope, Hatcher lost sight of Defendant twice for considerable periods of time and could not see Hatcher in the side yard in which he was arrested. All of the evidence indicates that Defendant took reasonable steps to maintain his privacy and did not expose himself to public view. Defendant therefore had a reasonable expectation of privacy in the curtilage of his residence.[2]

B. *Exigent Circumstances*

Next, the Government argues that exigent circumstances justified the warrantless arrest. The potential that a person may dispose of contraband may be exigent circumstances justifying warrantless seizures. *United States v. Shue*, 385 F.2d 416 (4th Cir. 1967) (finding that officers made a lawful seizure when they observed defendant with moonshine on his front porch because defendant might get rid of the contraband before the officers could obtain a warrant). On the other hand, the Supreme Court has held that

> ...no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.

*Horton v. California*, 496 U.S. 128, 137 n.7 (1990).

---

[2] The Government cites *Florida v. Riley* in support of the proposition that the use of visual enhancement devices has no bearing on the case. *Florida v. Riley*, 488 U.S. 445 (1989). I do not dispute the permissibility of using such devices in conducting surveillance. Nevertheless, *Riley* is inapposite. The issue in *Riley* was whether the officers' observations constituted a search. Even if *Riley* were applicable, the facts are not analogous. In *Riley*, the officers observed marijuana plants in a partially covered greenhouse with their naked eye from 400 feet above in a helicopter. Here, Hatcher viewed Defendant from approximately .6 miles or over 3000 feet away with the use of a high-powered scope. Furthermore, the officers in *Riley* first obtained a warrant based on their observations before they further searched the defendant's home and arrested him.

The Government claims that the fact that the gun could have been "secreted or moved to another location" was an exigent circumstance justifying the warrantless arrest. But that is certainly true of almost any contraband, and the Supreme Court has specifically said that the presence of contraband alone does not justify warrantless searches and seizures. Due to the nondisposable nature of a gun and the fact that Defendant was unaware that he was being observed, it is unreasonable to assume that Defendant would get rid of or destroy his gun. Hatcher could have left his vantage point and obtained a warrant before going to Defendant's house to arrest him without much risk of loss to the evidence. Therefore, exigent circumstances did not justify the warrantless arrest.

C. *Hot Pursuit*

Finally, the Government claims that Hatcher was in hot pursuit of Defendant at the time of the arrest. A warrantless arrest of a person in his home is permissible if an officer is in "hot pursuit" of that person and the person retreats from a public place into his home. *See Santana*, 427 U.S. at 42-43. A "pursuit" means some sort of chase. *Id.* Contrary to the Government's assertion, Hatcher was not in pursuit of Defendant because there was no chase. Not only was Defendant completely unaware that he was being observed, but he did not attempt to run when the three officers showed up at his home to arrest him. In fact, Defendant was fairly cooperative with the officers. Therefore, Hatcher was not in hot pursuit of Defendant.

## CONCLUSION

Defendant had a reasonable expectation of privacy in the curtilage of his home and was not in a public place at the time of his arrest. There were no exigent circumstances to justify the warrantless arrest, and the officers were not in hot pursuit. Defendant's warrantless arrest was therefore unlawful, and all evidence obtained as a result of that arrest must be excluded. For the reasons stated above, I **GRANT** Defendant's Motion to Suppress.

The clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this 12th day of May, 2005.

*[signature]*
Senior United States District Judge